**Opinion on en banc reconsideration issued July 23, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00200-CR

———————————

**LAJUAN CECILE BAILEY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Case No. 1298261**

---

## OPINION ON EN BANC RECONSIDERATION[*]

---

[*] We grant appellant's motion for en banc reconsideration, withdraw our opinion of October 7, 2014, vacate our judgment of the same date, and issue this en banc opinion and judgment in their stead. *See* TEX. R. APP. P. 49.7.

A jury convicted appellant Lajuan Cecile Bailey of failure to appear as required for a pretrial hearing. *See* TEX. PENAL CODE ANN. § 38.10. It assessed punishment at 10 years' confinement and a $10,000 fine. *See id.* § 12.34.

It was undisputed that Bailey failed to appear as required for a pretrial hearing, and her trial strategy was to invoke the statutory defense available when "the actor had a reasonable excuse" for her failure to appear in accordance with the terms of her release. *See id.* § 38.10(c). She affirmatively introduced evidence of communications with her lawyer in an attempt to establish her excuse that the lawyer failed to tell her that she had to appear—indeed, there was no conceivable other purpose for cross-examining her attorney. That was a plausible trial strategy, which entailed an implied waiver of the attorney–client privilege because it placed in issue all of her communications with her lawyer about the need to actually appear for hearings as required by the court.

Bailey now contends that she received ineffective assistance of counsel at trial. In the face of a disputed factual record and without the benefit of a post-trial evidentiary hearing, she claims that her trial counsel divulged privileged communications without authorization. To establish such a claim on direct appeal, an affirmative demonstration of deficient attorney performance and resulting harm must be firmly founded in the record. Although Bailey contends that she did not consent to the waiver of privilege in connection with her trial counsel's cross-

examination of her former lawyer, the trial judge expressly found that such a waiver in fact had occurred. That evidentiary ruling is supported by the record.

We hold that the trial court did not abuse its discretion to conclude that in the course of presenting the statutory defense of reasonable excuse, Bailey expressly waived privilege as to a significant part of her communications with her attorney, and the legal effect of the waiver could not be limited selectively to only those communications that were helpful to the defense. As a matter of law, the waiver also extended to all other related attorney communications which were relevant to the defense and thereby, in fairness, became admissible when Bailey injected those communications into the case. Because Bailey does not argue and the record does not reveal any other plausible strategy to defend the charge of failure to appear, there also has been no demonstration of harm.

Bailey also contends that the trial court erred in overruling her motion for mistrial based on the disclosure of her attorney–client communications. The trial court acted within its discretion to deny the mistrial because the testimony of which Bailey complains was introduced by her own attorney.

We affirm the judgment.

## Background

Our review of an ineffective-assistance claim on direct appeal requires evaluation of allegedly deficient performance in context of the totality of the

3

representation and in light of the entire record.[1] To the extent this appeal implicates the trial court's evidentiary determination that a privilege was waived, we owe "almost total deference" to an implied finding of any facts that would support the ruling and would be supported by the record, especially when such findings are based on an evaluation of credibility and demeanor.[2]

Lajuan Bailey was charged in 2009 with the felony offense of fraudulent use or possession of identifying information in Harris County.[3] She was charged with a separate instance of the same crime that same year in Jefferson County. In both cases, she was released from custody on bond pending trial.

---

[1] *See, e.g.*, *Okonkwo v. State*, 398 S.W.3d 689, 693 (Tex. Crim. App. 2013) (appellate review focuses on the objective reasonableness of counsel's actual conduct "in light of the entire record"); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) ("An appellate court looks to the totality of the representation and the particular circumstances of each case in evaluating the effectiveness of counsel.").

[2] *See, e.g.*, *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013); *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007) (reviewing trial court's decision on the applicability of privilege as an evidentiary ruling).

[3] *See* Act of May 22, 2007, 80th Leg., R.S., ch. 631, § 1, sec. 32.51, 2007 Tex. Gen. Laws 1204; Act of May 26, 2007, 80th Leg., R.S., ch. 1163, § 1, sec. 32.51, 2007 Tex. Gen. Laws 3991, 3992; Act of May 25, 2007, 80th Leg., R.S., ch. 1173, §§ 1–3, sec. 32.51, 2007 Tex. Gen. Laws 4012 (current version at TEX. PENAL CODE § 32.51).

## A. Circumstances of failure to appear

Bailey hired attorney Brian Roberts to defend her in both cases. A pretrial conference was scheduled to be held in Harris County on September 7, 2010. Fearing that the hearing would preclude him from attending a friend's funeral, Roberts arranged to have the conference reset. On September 2, he informed Bailey that the hearing had been rescheduled to September 21.

On September 8, Bailey's bond was revoked in Harris County because a new charge had been filed against her in Brazoria County. A warrant had issued for Bailey's arrest on that charge, felon in possession of a firearm. *See* TEX. PENAL CODE § 46.04(a).

Bailey was scheduled to appear for a separate hearing in Jefferson County on September 15, 2010. She did not appear. Her Jefferson County bond was forfeited, a capias was issued, and Roberts withdrew from representing her in that case. On September 21, she did not attend the rescheduled pretrial conference in Harris County. As a consequence, Roberts withdrew from representing her in the Harris County case as well, and the State charged Bailey with the offense of failure to appear.

## B. Voir dire

While selecting the jury, defense counsel Jeffrey Sasser previewed Bailey's strategy of presenting a reasonable excuse for her failure to appear. Sasser stated:

"The law for bail jumping does allow a defense if someone had a reason, a legitimate reason for not showing up." He then asked the venire panel whether there was "any reason" they could imagine "someone might not show up for court," eliciting responses that included "hospital," "family emergency," and "incarcerated." Sasser then asked: "What about if they didn't know, would that be a legitimate reason?" One venireperson responded "No," prompting Sasser to retort: "If they didn't know they were supposed to come to court?" The transcript indicates the panel responded "in unison": "No." This line of discussion then ended after the trial judge sustained an objection from the State.

## C. State's motion to compel

At the beginning of trial testimony, the court held a hearing on the State's motion to compel the testimony of Bailey's original defense attorney, Brian Roberts, as a witness to testify "about information regarding resets and information passed on by the defense attorney from the Court to his client for purposes of showing up in court." Roberts was present and asserted his unwillingness to divulge information relating to a former client unless ordered to do so by the court. The State argued that Roberts could be compelled to testify about his communication of court dates to Bailey, as the transmission of this information is exempt from the attorney–client communication privilege under the rule of *Austin*

*v. State*, 934 S.W.2d 672 (Tex. Crim. App. 1996). The trial court agreed, granted the State's motion to compel, and ordered Roberts to testify.

### D. Evidence of Bailey's failure to appear

The State called as witnesses Bailey's bail bondsman and several Harris County court employees, including the district court coordinator. The State relied on these witnesses to establish the basic facts supporting its case: Bailey was charged with a crime, she had been released on bond with the expectation that she appear in court when required, she was obligated to appear in court on September 21, and she did not appear. The bail bondsman testified that he had spoken to Bailey on September 8, and that she told him "that there was a reset, an off-docket reset." The bondsman also made several subsequent attempts to communicate with Bailey between September 8 and the next court date on September 21, but these were unsuccessful because she had moved and changed her phone number.[4]

---

[4] The dissent makes special note of the bondsman Stim Bowie's testimony, characterizing it as demonstrating that he believed, as Bailey claimed to believe, that "the September 8 revocation of her bond excused her from the obligation to appear on September 21." This mischaracterizes the testimony, in which Bowie agreed only with defense counsel's suggestion that after the bond had been revoked, no other action was required of Bailey "in that contract." Bowie's agreement that Bailey owed no further performance with respect to her contract to obtain a bail bond is not tantamount to agreement that Bailey also was excused from her obligation to the court to appear when required.

**E. Evidence of Bailey's knowledge of the Harris County court date**

On the second day of testimony, the State called Roberts to the stand, indicating that it intended to ask him about his representation of Bailey in the Jefferson County case. Defense attorney Sasser objected, arguing that any mention of Jefferson County and Bailey's failure to appear for trial in that case would be "highly prejudicial" and inadmissible under Rule 403.[5] The State argued that the evidence was admissible under Rule 404(b) in order to show motive or intent. The court ruled that the Jefferson County case should not be discussed unless the defense "opened the door."

Accordingly, throughout direct examination the State confined its questioning to the history of the Harris County matter. Roberts testified about a series of resets in the Harris County case. He explained that he requested the final reset because a close friend had died and there was a risk the funeral would coincide with the hearing. He sent a lawyer with whom he shared office space, Chip Lewis, to obtain the reset. He further confirmed that he had telephoned Bailey on September 2 and told her about the reset.

---

[5] Bailey does not claim on appeal that the injection of extraneous offense evidence constituted deficient performance by her trial counsel. Accordingly, the dissent's repeated references to the disclosure of an extraneous offense miss the mark—they have nothing to do with Bailey's contention on appeal that her privilege was violated.

## F. Cross-examination of former attorney

During cross-examination, Sasser initially asked questions critical of Roberts's handling of the reset. For example, he asked Roberts why he had sent another attorney to handle it and why he failed to consult with Bailey prior to rescheduling. Eventually, Sasser changed subjects to the Brazoria County charge. That subject had not been part of the State's direct examination, and the new line of defense questioning prompted a renewed discussion of the attorney–client privilege:

> Sasser: Do you remember having—I know this is real touchy because of the attorney–client privilege. For purposes of my questioning, if I ask you a question that invades attorney–client privilege, you can assume it's okay to answer. *I've talked to my client about this.* Okay? I want to go into specific conversations. I want to have my client—
>
> Prosecutor: Judge, may we approach.

(Emphasis supplied.) At the bench, the prosecutor then stated: "I think for Mr. Roberts's protection, he's worried about going into this and he needs to hear that from the client outside the presence of the jury so that Mr. Roberts is comfortable that she is allowing him to answer the questions." The judge then excused the jury from the courtroom, and the discussion continued in Bailey's presence:

> Sasser: Judge, at this time I anticipate asking Mr. Roberts about communications that he had with my client

regarding the warrants that came up from Brazoria County. Not from Jefferson County, not from Beaumont. We already talked about this earlier, but the fact, you know, [the prosecutor] had come in here and gotten the bond revoked, she had these new cases in Brazoria County, I basically want to talk about the conversations he might have had with her about that and the fact—

The Court: *You discussed these with your client?*

Sasser: *Yes, sir, I have.*

The Court: Alright. I will allow you to.

Sasser: For my protection, may I get something on the record from my client?

The Court: Any objection?

Prosecutor: No, Judge. I think for Mr. Roberts, he needs to hear it out of Ms. Bailey's mouth that she's waiving the privilege between her and the attorney.

Sasser: You just heard what I discussed with the judge.

Defendant: *Only on one case. That's the only case that was because I had no other charges. There was only one case filed.*

Sasser: Are you waiving the attorney–client privilege by your prior attorney, Mr. Roberts, for me to question him regarding communications that you may have had with him around September 2nd, 2010 regarding your outstanding cases, the Brazoria cases?

Defendant: *Yes, one case.*

The Court: All right. Anything further?

10

Prosecutor: Not unless Mr. Roberts has questions of his prior client or has concerns.

Sasser: I think it's clear she waived the privilege at this point. I'm offering Mr. Roberts the opportunity if he doesn't feel uncomfortable (sic) or doesn't need to make inquiries so we don't have to take the jury back out.

Mr. Roberts, do you think that's adequate for the attorney–client privilege for you to answer the questions unencumbered by attorney–client privilege you used to have with Ms. Bailey?

Roberts: I didn't quite hear what it is she's waiving. I don't feel comfortable testifying to anything unless I hear directly from her the particular privileged conversations that she's waiving her privilege to. Are you waiving privilege—

Defendant: I'm only waiving privilege to the one case that was filed against me in Brazoria County during this time because everything did not happen at the same time. Do you understand what I'm saying?

Roberts: Correct.

Defendant: There's only one thing that changed during the whole time I was on bond, that is the only thing that I'm talking about and referencing, not everything subsequent or after the fact.

Sasser: She had a gun case, the initial case filed in Brazoria County, felony possession of a gun. That was the warrant [the prosecutor] came in and showed you. I would assume. I wasn't here, Judge. She picked up this new case in Brazoria and you revoked her bond.

Roberts: That's the only thing. Nothing else. I understand.

Defendant: Just only that.

(Emphasis supplied.)

In response to questioning by the defense, Roberts confirmed that during the time leading up to the September 21, 2010 Harris County court date, Bailey had an "open warrant" stemming from the Brazoria County charge. Sasser probed the extent to which Roberts informed Bailey of the seriousness of the warrant and the need to present herself to authorities. He elicited testimony confirming that Roberts prepared the motion to withdraw in advance of the hearing because he knew that Bailey would not be coming to court, and explaining how he knew that.[6] As Sasser continued to probe the attorney-witness's communications with his former client, he reassured him: "We'll get through this. It's all out right now. The jury is going to hear about everything. Don't worry about the attorney–client. *Everything has been waived at this point.*" (Emphasis supplied.)

---

[6] Under the pressures of a cross-examination that placed his professionalism at issue, Roberts displayed an admirable sensitivity to respecting his former client's privilege. When the questioning about his client communications first veered away from the Brazoria County charges, it was Roberts who provoked a careful consideration of how the cross-examination was unfolding. When asked how he knew that Bailey would not be coming to court for a hearing in Harris County (such that it was recited in the written motion he had brought with him to court on the date of the hearing as a reason supporting his request to withdraw), Roberts suggested that counsel "might want to approach" the bench. The ensuing bench conference yielded no clarity with respect to the privilege, and Bailey's trial counsel asked the question again, specifically instructing the witness: "You can answer that." Roberts sought guidance from the trial judge, who stated: "You may."

The exchange between defense attorney and former-attorney witness apparently became heated when Sasser asked questions suggesting that Roberts, along with his office mate Lewis, had been demanding higher fees of Bailey in the wake of the Brazoria County charges. Roberts denied attempting to charge Bailey more for the cases he had been retained to handle in Jefferson and Harris Counties, and he also explained that his office mate, Lewis, did offer to defend her against the fresh charges in Brazoria County for an additional fee.

Sasser eventually asked Roberts whether he warned Bailey that she would be "making a huge mistake" by not appearing and forsaking the opportunity for plea bargains he had been negotiating. Roberts replied that on September 14 he had emailed, texted, and called Bailey to advise her of what would happen if she did not appear for court in Jefferson County. In response to Sasser's questions, Roberts revealed that he had expressly warned Bailey by email that her failure to appear in Jefferson County would likely result in a felony "bond jumping charge" and also "necessarily complicates your Harris County case."

When another discussion of the privilege ensued, the trial court stated its understanding that "we have opened the door, we have come into both the Jefferson County charges and the Brazoria County charges, along with the charge here." When Bailey interjected that she "was very specific in saying that I wanted

to stick to the Brazoria County charge," the trial judge reiterated that "the door has been opened as to both charges" and that the privilege had been waived.

When trial resumed the next day, the parties continued to debate the privilege issue in the context of defense motions for mistrial and, in the alternative, to strike the testimony relating to the Jefferson County charges. Among other responses, the State argued that Bailey's privilege had been waived for several reasons:

> Number one, they were accusing Mr. Roberts of something, therefore, the privilege disappears so he can defend himself. Number two, it was brought up by the defense as a contemplated part of their [reasonable-mistake] defense. Number three, the defendant did not assert her privilege after hearing her lawyer say: The privilege is waived, go ahead and answer the question. And she very easily could have done that over the long period of time at some point, Judge.[7]

The trial court denied the motion for mistrial and the motion to strike.

---

[7]    The dissent suggests that the State never argued implied waiver. But as quoted above, the trial court initially excluded testimony about the Jefferson County charge unless the defense "opened the door," and the State did argue at trial, in support of the trial court's later waiver finding, that "it was brought up by the defense as a contemplated part of their defense." This response did express, in general terms, the substance of the implied-waiver argument. Moreover, we "may uphold a trial court's ruling on any legal theory or basis applicable to the case." *Martinez v. State*, 91 S.W.3d 331, 336 (Tex. Crim. App. 2002); *see also Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007) ("as long as the trial court's decision was within the zone of reasonable disagreement and was correct under any theory of law applicable to the case, it must be upheld").

14

Sasser then continued his cross-examination of Roberts. He immediately and affirmatively elicited testimony that although Roberts had called, texted, and emailed Bailey the day before her scheduled appearance admonishing her to appear in Jefferson County, he did not repeat these communications in regard to Harris County. In phrasing his questions, Sasser emphasized that Bailey's bond had been revoked in Harris County prior to her scheduled appearance on September 21, whereas in Jefferson County, Bailey's bond had not been revoked prior to her failure to appear there on September 15.

Later, during recross-examination, Sasser returned to the substance of the communications about the Jefferson County case, and he asked Roberts to confirm that Bailey understood that if she had appeared at the hearing in Beaumont, she would have been taken into custody.

### G. Bailey's testimony

Once the State rested, the defense called Bailey to the stand. She emphasized that she had not wanted to be taken into custody on the Brazoria County warrants because she wanted the opportunity "to take care of everything" and have her "fair day in court." She also discussed meetings in which Roberts's office mate, Lewis, offered to defend her on the Brazoria County charge for $30,000. According to Bailey, in addition to allowing Roberts to attend a funeral, the rescheduling of the

15

Harris County hearing also served the purpose of giving her "more time out there in the free world to get money together to give attorneys."

After reviewing the substance of these discussions with attorneys Roberts and Lewis, defense counsel asked Bailey about her understanding of her general status at that time with respect to her various pending criminal proceedings. Bailey's response specifically addressed the outstanding warrants for her arrest:

> Q. (By Mr. Sasser) Okay. So, after you left your meeting, that last meeting, the one that was right before the off-docket reset was done, did you feel like if you got this money together that you would be able to stay out of custody and fight your cases like you had been out before?
>
> A. Yes, I did.
>
> Q. And why?
>
> A. Because . . . once retained and everything, the plan was to do a non-arrest bond in Brazoria County. That would have alleviated any warrants, I wouldn't have had warrants in any counties, and I would have had a good reputable person from Brazoria County to help me fight the charge that was brought against me.

Defense counsel also asked Bailey to explain her failure to appear in Jefferson County:

> Q. Why did you not go to Beaumont when you were supposed to go? You said you had multiple reasons. You were talking about your first reason.
>
> A. Okay. The first reason I had is because of my bond being revoked in Harris County. I wasn't prepared for that. The second reason was because when speaking with my attorney at that time, when he—when Mr. Roberts said he sent me the

16

> e-mail, I didn't even get the e-mail. I was under the impression that our plan was to handle all of my cases at one time, and, you know, I guess to have a plan for everything.

She thus testified that she did not appear in Jefferson County because she "wasn't prepared" for her bond revocation in Harris County, and she was under the "impression" that the "plan" arranged with her attorney was to consolidate and resolve all of the pending charges. When Bailey was asked why she did not appear in Harris County on September 21, she answered, "Because according to the agreement I had on the bail agreement, my bond was revoked." Bailey went on to explain that she had a background in real estate and was familiar with contracts.

Rather than relying on Bailey's own lay understanding of the implications of the revocation of bail to establish the reasonableness of her excuse, defense counsel then sought to bolster the reasonableness of Bailey's understanding of her contract with the bonding company:

Q.  (By Mr. Sasser) Well, what did you do when you found out it was revoked? Did you try to get an understanding of this agreement?

A.  Yes, I did.

Q.  Who did you try to get that understanding from?

A.  From my attorney, Mr. Roberts, and from the bonding company.

17

**H. Defense closing argument and judgment of conviction**

The jury charge contained an instruction on the defense of reasonable excuse that specifically addressed Bailey's claim that she had believed the revocation of her Harris County bond on September 8 relieved her of the obligation to attend court on September 21. *See* TEX. PENAL CODE § 38.10(c). In his closing argument, Sasser admitted that Bailey had failed to appear but argued that the jury should acquit her because she had a reasonable excuse. He contrasted Bailey's situation in Jefferson County, where her bond had not been revoked, and her circumstances in Harris County, where bond had been revoked prior to her scheduled appearance.

Sasser noted that Roberts had specifically warned Bailey to appear in Jefferson County, but he had not warned her about Harris County. He emphasized that in response to the charges pending against her in three different counties, Bailey did "the one thing she knows to do, call her attorney, says: Hey what do we do?" The thrust of this argument was that she reasonably placed her trust in Roberts to manage the situation, and that his failing rather than hers resulted in her failure to appear. Sasser argued:

> We know he didn't send her anything else to say: Hey, look you need to come to Houston. You need to come to this court as well or else this could happen. We know that because he said he did not e-mail her anything.
>
> . . . .

The defendant testified and said she had conversations with Mr. Roberts. And, basically, it was, you know, if you can get this money together, we can try to take care of your problems. And that's what she was trying to do.

. . . .

. . . She was trying to get a solution. She was counting on her attorneys at the time to help her out of—a helpless situation, really, at the time; but in her mind, she was thinking, maybe I can still stay out. I mean, as a defendant that's what you think. I don't want to be in jail. And she's thinking, if I can get this money together *like my attorneys told me*, they can take care of all this stuff. By the way, my bondsmen already told me my bond is revoked in the court. *My attorneys already told me my bond is revoked in the court. There's no consequence.* If I don't go to court, I'm just going to get my affairs in order, try to get money together, get all cases consolidated, taken care of.

(Emphasis supplied.) Sasser thus argued that Bailey's course of conduct had been sanctioned by the attorneys she had retained to manage her legal problems, emphasizing her desire to remain free from custody so that she could gather money to hire Lewis as her attorney in Brazoria County and consummate her plans with Roberts to resolve the Jefferson County and Harris County charges together.

The jury found Bailey guilty, and after a hearing on punishment, imposed a fine of $10,000 and a prison sentence of ten years. The judge entered judgment on the jury's verdict. Bailey filed a notice of appeal and Sasser moved to withdraw.

**Analysis**

Bailey argues that she received ineffective assistance of counsel and that the trial court erred by denying her motion for mistrial.

19

## I. Ineffective assistance of counsel

Bailey argues that she received ineffective assistance of counsel, but only based upon a portion of Sasser's cross-examination which elicited testimony about attorney–client communications. The only examination alleged to be deficient was that which came before the trial judge ruled "the door has been opened" to questioning about Jefferson County. Bailey does not complain on appeal that Sasser rendered ineffective assistance by failing to explain the legal implications of her express waiver of privilege, by opening the door to evidence about the Jefferson County extraneous offense, by continuing his examination on that subject after the denial of a mistrial, or by arguing to the jury that she had a reasonable excuse based on her communications with her lawyer.

The constitutional right to counsel in a criminal prosecution exists to protect the fundamental right to a fair trial. *Strickland v. Washington*, 466 U.S. 668, 684, 104 S. Ct. 2052, 2063 (1984). In this context, "a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." *Id*. at 685, 104 S. Ct. at 2063. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686, 104 S. Ct. at 2064. "This right does not mean errorless or perfect counsel whose competency of

representation is to be judged by hindsight." *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). Claims that a defendant received ineffective assistance of counsel are governed by a two-part test: (1) whether the attorney's performance was deficient, i.e., did counsel make errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment; and if so, (2) whether that deficient performance prejudiced the party's defense. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. "An appellate court looks to the totality of the representation and the particular circumstances of each case in evaluating the effectiveness of counsel." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); *see also Okonkwo v. State*, 398 S.W.3d 689, 693 (Tex. Crim. App. 2013) (appellate review focuses on the objective reasonableness of counsel's actual conduct "in light of the entire record").

The adequacy of attorney performance is judged against what is reasonable considering prevailing professional norms. *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065. There is a strong presumption that, considering the circumstances, a lawyer's choices were reasonably professional and motivated by sound trial strategy. *Id.* at 689, 104 S. Ct. at 2065; *Nava v. State*, 415 S.W.3d 289, 307–08 (Tex. Crim. App. 2013). In the face of this presumption, a criminal defendant has the burden of showing by a preponderance of the evidence that his attorney failed to provide constitutionally adequate representation. *Bone v. State*, 77 S.W.3d 828,

21

836 (Tex. Crim. App. 2002). Limitations of the record often render a direct appeal inadequate to raise a claim of ineffective assistance of counsel. *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). "An ineffective-assistance claim must be firmly founded in the record and the record must affirmatively demonstrate the meritorious nature of the claim." *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012); *see also Thompson*, 9 S.W.3d at 813. That necessary firm foundation is lacking in this direct appeal. As such, this is not the "rare case in which the trial record will by itself be sufficient to demonstrate an ineffective-assistance claim." *Nava*, 415 S.W.3d at 308.

As applicable to this case, Rule 511(1) of the Rules of Evidence provided: "A person upon whom these rules confer a privilege against disclosure waives the privilege if . . . the person . . . voluntarily discloses or consents to disclosure of any significant part of the privileged matter unless such disclosure itself is privileged." TEX. R. EVID. 511(1).[8] The mere disclosure of privileged materials by a defendant's lawyer, by itself, does not give rise to a presumption of waiver. *Carmona v. State*, 941 S.W.2d 949, 953 (Tex. Crim. App. 1997). Nevertheless,

---

[8]    Effective April 1, 2015, Rule 511 has been amended with the design of aligning Texas law with federal law on waiver of privilege by voluntary disclosure. Misc. Docket No. 14–9232 (Tex. Nov. 19, 2014); *see also* TEX. R. EVID. 511 cmt. (2015). Rule 511(1) as quoted above remains as part of the "General Rule" as stated in the new Rule 511(a).

"the totality of the circumstances and reasonable inferences therefrom may support a finding of waiver." *Id*. at 954; *Wright v. State*, 374 S.W.3d 564, 579 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

Courts have recognized several circumstances in which the waiver of a privilege is implied. Consistent with Rule 511's acknowledgement that consent to disclosure of "any significant part" of a privileged matter may constitute waiver of the whole, a privilege may not be waived selectively to disclose only such evidence as may be beneficial to the party holding the privilege.[9] In this sense, a

---

[9] *See Rodriguez v. State*, 94 S.W.2d 476, 479–80 (Tex. Crim. App. 1936) (finding implied waiver of attorney–client privilege and admitting attorney's testimony about guilty plea, over objection, when appellant testified that former guilty plea was made on attorney's advice); *Jones v. State*, 181 S.W.3d 875, 878 (Tex. App.—Dallas 2006, pet. ref'd); *Carmona v. State*, 947 S.W.2d 661, 664 (Tex. App.—Austin 1997, no pet.); 1 McCORMICK ON EVIDENCE § 93 (7th ed. 2013) ("Waiver may be found . . . from conduct such as partial disclosure which would make it unfair for the client to invoke the privilege thereafter."); *cf. Wilkens v. State*, 847 S.W.2d 547, 551 (Tex. Crim. App. 1992) (Appellant's Fifth Amendment rights were not violated when he introduced part of psychiatric examination evidence to prove insanity defense and State introduced testimony from examining psychiatrists to rebut his presentation of defense); *Draper v. State*, 596 S.W.2d 855, 857 (Tex. Crim. App. [Panel Op.] 1980) ("Once having related part of the facts of the transaction, a witness should not be permitted to assert a Fifth Amendment privilege to prevent disclosure of additional relevant facts."); *Stephens v. State*, 59 S.W.3d 377, 380 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd); *Aetna Cas. & Surety Co. v. Blackmon*, 810 S.W.2d 438, 440–41 (Tex. App.—Corpus Christi 1991, orig. proceeding) (waiver found when holder of privilege deliberately revealed privileged matter while preparing an expert witness to testify).

privilege cannot be used simultaneously "as a shield and a sword": after a partial disclosure is used as a sword to gain litigation advantage, the privilege cannot then be used to shield the remainder of the privileged communication.[10] With specific reference to the attorney–client communication privilege, it may be implicitly waived by raising issues regarding the performance of counsel,[11] particularly if an issue is injected into the case which requires the attorney's testimony.[12] And a

---

[10] *See In re Lott*, 424 F.3d 446, 454 (6th Cir. 2005) ("litigants cannot hide behind the privilege if they are relying upon privileged communications to make their case"); *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003); *In re von Bulow*, 828 F.2d 94, 103 (2d Cir. 1987); *see also Clark v. United States*, 289 U.S. 1, 15, 53 S. Ct. 465, 469 (1933) ("The privilege takes flight if the relation is abused."); *Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 163 (Tex. 1993) ("In an instance in which the privilege is being used as a sword rather than a shield, the privilege may be waived.").

[11] *See Lott*, 424 F.3d at 452–53; *Bittaker*, 331 F.3d at 718–19 (citing *Hunt v. Blackburn*, 128 U.S. 464, 9 S. Ct. 125 (1888)); *see also U.S. Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 212 (3d Cir. 1999) (privilege waived when party "has made the decision and taken the affirmative step in the litigation to place the advice of the attorney in issue") (quoting *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1994)); *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1175 n.1 (7th Cir. 1995) (noting that "the attorney–client privilege is generally waived when the client asserts claims or defenses that put his attorney's advice at issue in the litigation"); *Developments in the Law–Privileged Communications, Implied Waiver*, 98 HARV. L. REV. 1629, 1638 (1985) ("The privilege is held to be waived when a client attacks the quality of his attorney's advice . . . .").

[12] *See Lott*, 424 F.3d at 453 (citing *Johnson v. Alabama*, 256 F.3d 1156, 1178 (11th Cir. 2001). This particular means of implied waiver often arises through allegations of ineffective assistance. *See, e.g.*, *Bittaker*, 331 F.3d at 716–17; *Tasby v. United States*, 504 F.2d 332, 336 (8th Cir. 1974) ("When a

24

defense based on an assertion of good-faith reliance on the advice of counsel also has been held to impliedly waive the attorney–client communication privilege.[13] The touchstone of these various theories of implied waiver is that some litigation conduct requires, in fairness, that the remainder of the privileged communication be divulged.[14] The scope of an implied waiver of privilege is a legal question to be

---

client calls into public question the competence of his attorney, the privilege is waived."); *Youkers v. State*, 400 S.W.3d 200, 212 (Tex. App.—Dallas 2013, pet. ref'd) ("Youkers necessarily placed in issue privileged communications when he argued his attorney breached her legal duty to provide effective assistance of counsel").

[13] *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *see also United States v. Workman*, 138 F.3d 1261, 1263–64 (8th Cir. 1998); *Livingstone v. N. Belle Vernon Borough*, 91 F.3d 515, 536–37 (3rd Cir. 1996); 1 MCCORMICK, *supra*, § 93 ("if a party interjects the 'advice of counsel' as an essential element of a claim or defense, then that party waives the privilege as to all advice received concerning the same subject matter").

[14] *See, e.g.*, *Bittaker*, 331 F.3d at 719 ("courts and commentators have come to identify this simple rule as the fairness principle"); *Bilzerian*, 926 F.2d at 1292 ("the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications"); *see also United States v. Miller*, 600 F.2d 498, 501 (5th Cir. 1979) ("We obviously cannot condone a practice that enables a defendant or any witness, after giving the jury his version of a privileged communication, to prevent the cross-examiner from utilizing the communication itself to get at the truth."). Consistent with this principle, the recent amendment to Texas Rule of Evidence 511, effective April 1, 2015, provides that when a voluntary disclosure covered by the attorney–client privilege is made in a state proceeding, the waiver extends to undisclosed communications only if:

> (A)   the waiver is intentional;

determined under the rules of evidence,[15] and thus it is not necessarily defined by the client's own articulation of the scope of privilege she intends to waive while at the same time authorizing disclosure of privileged communications considered helpful to her.

All of these considerations are implicated by this case. Bailey's defense theory was reasonable mistake. That theory was substantially predicated on her reliance on the counsel she claimed she received from her attorney.[16] In the course

---

<div style="margin-left: 2em;">

(B)    the disclosed and undisclosed communications or information concern the same subject matter; and

(C)    they ought in fairness be considered together.

</div>

TEX. R. EVID. 511(b)(1).

[15] *Cf. Granada Corp. v. Honorable First Court of Appeals*, 844 S.W.2d 223, 225 (Tex. 1992) (orig. proceeding) (acknowledging trial court must "interpret legal rules" in evaluating waiver of privilege).

[16] The dissent suggests that "[p]rior to Sasser's cross-examination of Roberts during which confidential evidence related to the extraneous offense in Jefferson County was disclosed, there was *no evidence* that appellant blamed her mistaken belief on advice of counsel or that Roberts ever told her that she did not need to appear at trial." Such evidence would not be necessary for the trial court to conclude that Bailey had waived privilege by consenting to disclosure of a "significant part" of her attorney communications, *see* TEX. R. EVID. 511, but regardless, a review of the entire trial record shows otherwise. As early as voir dire, defense counsel previewed the reasonable-mistake trial strategy by asking the venire panel whether there was "any reason" they could imagine "someone might not show up for court." Before Roberts was called to the stand, Sasser cross-examined the court coordinator about the procedures applied when a defendant fails to appear, and asked: "If

of examining her former lawyer to establish her legal defense, Bailey stated an intention to limit the scope of her waiver of the privilege. Sasser sought to exploit that attempted limitation through selective disclosure, eliciting Roberts's testimony only about communications expected to be helpful to the defense theory—a tactic which was harshly critical of the witness's professionalism. Through his questions Sasser disclosed communications about the proposed Brazoria County representation, using that testimony to portray the advice as tainted by the desire to collect a fee. His questions also caused the disclosure of communications concerning the need to actually appear for the Harris County hearing, which he depicted as inadequate relative to the risk of not appearing, as well as confused by the effect of the prior bond revocation. All this evidence was selectively elicited

the defense attorney were to come to you and say: Hey, look, I just forgot to tell my client, my bad, my mistake, is that any type of problem?" In response, the coordinator stated: "They need to address it with the Judge." Then before any testimony was elicited about attorney–client communications relating to the Jefferson County charge, Sasser used his cross-examination to suggest that Roberts failed to adequately advise Bailey about the importance of appearing for the pretrial hearing and the potential consequences of failing to appear. Accordingly, it is not the case, as apparently suggested by the dissent, that the defense theory of reasonable mistake due to reliance on counsel arose merely as an afterthought to mitigate the damage after defense counsel deliberately elicited "confidential evidence related to the extraneous offense in Jefferson County," or that the theory of reasonable mistake fortuitously sprang from the testimony of the bail bondsman.

and offensively used in furtherance of the strategy of proving the reasonable-mistake defense.

Bailey's apparent desire to exclude evidence about the Jefferson County communications constituted an assertion of the privilege as a shield against the use of what turned out to be prejudicial information divulged as part of the broader context of the representation: that Roberts actually had documented his significant efforts to inform and advise her about the consequences of a failure to appear. Those communications were interconnected with communications about the Harris County case in both time and substance. Bailey failed to appear for a court date in Harris County less than a week after she failed to appear in Jefferson County, against Roberts's strongly worded advice which expressly warned that a failure to appear "necessarily complicates your Harris County case." To affirmatively rely upon suggested deficiencies in the evidence of communications about the need to appear in Harris County while excluding the evidence about the need to appear in Jefferson County would leave an unfair and misleading impression that Roberts had not adequately advised Bailey about the serious implications of failing to appear.

The decision to divulge a substantial part of her privileged communications to establish a defense of reasonable mistake in this case—for which Bailey gave express consent—was itself sufficient to waive privilege as to the additional related

and relevant interwoven communications. *See* TEX. R. EVID. 511. That waiver was implied, and the proverbial door was opened, well before Sasser ever crossed the boundary of express consent through the questions now alleged to constitute deficient performance on his part. It was already implied by the time Sasser elicited the communications about the failure to appear in Jefferson County.

A waiver of privilege is narrowly construed,[17] and the reasonable-mistake defense was not a blanket waiver of all attorney–client communications, including ones unrelated to the mistake defense.[18] But by pursuing a strategy and persistently arguing that she had a reasonable excuse for her failure to appear based on her communications with her lawyer, Bailey did place all her communications with Roberts relevant to that particular subject at issue. This understanding of the challenged line of questions is essentially conceded on page 4 of the appellant's brief, which concedes: "As part of her reasonable explanation defense, Bailey

---

[17] "Implied waivers are consistently construed narrowly. Courts 'must impose a waiver no broader than needed to ensure the fairness of the proceedings before it.'" *In re Lott*, 424 F.3d at 453 (quoting *Bittaker*, 331 F.3d at 720). This is because "[a] broad waiver rule would no doubt inhibit the kind of frank attorney–client communications and vigorous investigation of all possible defenses that the attorney–client and work product privileges are designed to promote." *Bittaker*, 331 F.3d at 722.

[18] *Cf. Marathon Oil Co. v. Moye*, 893 S.W.2d 585, 590 (Tex. App.—Dallas 1994, no writ) (voluntary disclosure of significant part of privileged material can result in implied waiver of privilege to other documents, though waiver does not automatically allow disclosure of all privileged materials).

29

consented to waiver of the privilege regarding a charge in Brazoria County." Despite the self-serving limitations stated as part of Bailey's express consent, by asserting the defense she necessarily consented to waiver of all the related and interwoven communications, including those about the importance of appearing in Jefferson County.

In response to this implied-waiver analysis, the dissent attempts to distinguish this appeal from *Carmona v. State*,[19] observing that in *Carmona* the defendant's selective disclosure of privileged polygraph results related to "the defense of the same charged offense" (sexual assault and indecency with a child) as did the incriminatory statements made before the polygraph exam, which the defendant sought to protect from disclosure. Meanwhile in this appeal, the dissent emphasizes that "Roberts represented appellant in two separate cases"—i.e., separate charges of fraudulent use or possession of identifying information filed in Jefferson and Harris Counties—and "[d]iscussions that the two may have had about one case would not be relevant and admissible as to the other." The distinction of two separate charges makes no difference in this appeal, in which the communications on both of two charges had relevance to Bailey's reasonable-excuse defense to a separate third charge, arising from her later failure to appear in court as required in Harris County. The attorney–client communications about the

---

[19]    947 S.W.2d at 664.

need to appear had no relevance and would not have been admissible on either of the original Jefferson County and Harris County charges. Those communications only gained relevance and became admissible when Bailey injected them into the trial on a separate charge in her attempt to prove that she had a reasonable excuse for failing to appear.

The trial judge ruled that Bailey had waived her privilege. The record supports that ruling. Like other evidentiary rulings, a trial court's ruling determining that a privilege has been waived is reviewed for abuse of discretion, is upheld when it is within the zone of reasonable disagreement, and may not be reversed "solely because the appellate court disagrees with the decision."[20] Considering the totality of the circumstances and the reasonable inferences therefrom, the trial court did not abuse its discretion in finding implied waiver. The record does not provide a firm foundation to affirmatively establish that confidential communications were elicited without Bailey's actual consent, as the

---

[20] *Cameron*, 241 S.W.3d at 19–20; *Carmona*, 947 S.W.2d at 664. Due to the fact-specific nature of the inquiry, courts also have reviewed implied waiver rulings in particular for abuse of discretion. *See, e.g.*, *Davis*, 856 S.W.2d at 164 (reviewing trial court's decision on waiver of attorney–client privilege for abuse of discretion); *In re Grand Jury Proceedings*, 219 F.3d 175, 183 (2d Cir. 2000) ("Whether fairness requires disclosure has been decided by the courts on a case-by-case basis, and depends primarily on the specific context in which the privilege is asserted."); *but see United States v. Mendelsohn*, 896 F.2d 1183, 1188 (9th Cir. 1990) (reviewing de novo court's holding that privilege had been waived).

record is conflicted on that subject.[21] Ordinarily, we may presume that an

appellant's trial lawyer fully explained the possible consequences of eliciting

---

[21] Bailey's depiction of the record in this regard is materially incomplete in its failure to acknowledge and address the totality of the circumstances and the reasonable inferences therefrom, including aspects of the record that do suggest an actual waiver of the privilege as found by the trial court, her statements on the record notwithstanding. Our dissenting colleagues reach the opposite conclusion by ignoring the implied-waiver doctrine and by accepting Bailey's and Sasser's statements as the conclusive facts concerning their communications. The trial judge, who was in a better position in the courtroom to observe these events as they transpired, concluded otherwise, and the dissent does not contend that there was no evidence to support that conclusion. The case identified in the dissent, *Ex parte Varelas*, 45 S.W.3d 627 (Tex. Crim. App. 2001), provides no authority for overriding the trial judge's discretion as to this issue. Unlike Bailey's direct appeal, which comes to us without the benefit of a post-trial evidentiary hearing, *Varelas* was an appeal from the denial of a post-conviction application for a writ of habeas corpus. *Varelas*, 45 S.W.3d at 629. On the direct appeal in that case, the Court of Criminal Appeals had rejected the appellant's claim of ineffective assistance, noting the inadequacy of the record. *Id*. at 632 (citing *Varelas v. State*, No. 72178, slip op. at 10–11 (Tex. Crim. App. Mar. 4, 1997) (not designated for publication)). The crucial *Varelas* affidavit was submitted after trial had concluded, in the context of the post-conviction habeas proceeding. On the particular facts of that case, the Court concluded that the trial court's finding that trial counsel had used sound trial strategy in not requesting a limiting instruction relating to evidence of the appellant's extraneous acts was "unsupported by the record." *Id*. at 632 n.5; *see also id*. at 646–47 (Holland, J., concurring in the denial of rehearing) ("I stand by the Court's opinion that there is no evidence in the record to suggest that the failure to request limiting instructions was the result of trial strategy."). *Varelas* thus involved a record that gave no support to the trial court's crucial factual finding in support of its ruling, and as such it is readily distinguishable from this direct appeal and its conflicted record relating to the waiver issue.

evidence at trial.[22] Thus, at this procedural stage and on this record, there is no need to address whether it would have been constitutionally deficient performance in this case for trial counsel to inadvertently effect an implied waiver of privilege by a selective disclosure of privileged communications, when the record reflects that the selective disclosure was expressly authorized by the client, but the record is silent as to whether counsel actually and correctly advised his client about the legal effect of the selective disclosure (other than counsel's twice-repeated assurance to the court that he had discussed the matter with the defendant).

Given the statutory defense of reasonable mistake and counsel's evident strategy in advocating for an acquittal on that basis, this appeal does not conclusively establish that trial counsel's questions about Jefferson County were so outrageous that no reasonable attorney would have asked them. "[T]rial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective," *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003), and that has not yet happened in this case outside the context of trial

---

[22] *See Robertson v. State*, 187 S.W.3d 475, 484 (Tex. Crim. App. 2006) (citing *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052); *see also Carmona*, 947 S.W.2d at 664 (concluding based on evaluation of record that it was "not irrational for the trial court to infer" that the client authorized a disclosure of privileged communications, "hoping for favorable results").

counsel's active, ongoing representation of Bailey.[23] Certainly the circumstances here are not comparable to other examples of alleged misconduct that the Court of Criminal Appeals has found insufficiently outrageous to support a finding of deficient performance in the absence of an explanation by counsel.[24]

Bailey also cannot demonstrate harm under the second prong of *Strickland*. Despite Sasser's statements to the effect of "falling on his sword," after unsuccessfully moving for a mistrial he subsequently made the strategic decision to continue to elicit confidential communications from Roberts and to use them to argue the reasonable-mistake defense. The record does not provide a firm foundation for a claim that Bailey was harmed by this, considering that the evidence was all but conclusive as to her guilt on the failure to appear charge, save the possibility of persuading the jury she had a reasonable excuse.

---

[23] *See also State v. Thomas*, 428 S.W.3d 99, 106 (Tex. Crim. App. 2014) ("When counsel faces an ineffective-assistance claim, the attorney–client privilege is waived, and trial counsel has the opportunity to explain his actions."); *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002) ("Under our system of justice, the criminal defendant is entitled to an opportunity to explain himself and present evidence on his behalf. His counsel should ordinarily be accorded an opportunity to explain her actions before being condemned as unprofessional and incompetent.").

[24] *See, e.g.*, *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) (failure to object to an infringement of the client's right to confront witnesses); *Goodspeed v. State*, 187 S.W.3d 390, 393–94 (Tex. Crim. App. 2005) (failure to ask questions on voir dire); *Thompson*, 9 S.W.3d at 814 (failing to continue objecting to significant hearsay).

We overrule Bailey's first issue alleging ineffective assistance of counsel.

## II. Mistrial

In the alternative, Bailey contends that the trial court abused its discretion when it denied her motion for mistrial. She claims that Roberts's disclosure of privileged information was highly prejudicial, that no curative measures were taken by the court, and that the disclosure likely affected the jury's verdict.

In addition to our explanation, above, that the privilege already had been waived before the line of questions that gave rise to the motion for mistrial, we also note that the testimony of which Bailey now complains was introduced by her own attorney. "[A] defendant may not complain of evidence elicited by [her] own attorney." *Ex parte Ewing*, 570 S.W.2d 941, 948 (Tex. Crim. App. [Panel Op.] 1978); *see also Durrough v. State*, 672 S.W.2d 860, 873 (Tex. App.—Corpus Christi 1984). Therefore, the trial court did not abuse its discretion in refusing to grant a mistrial.

## Conclusion

We affirm the judgment of the trial court.

Michael Massengale
Justice

Panel consisted of Chief Justice Radack and Justices Massengale and Huddle.

En banc reconsideration was requested. TEX. R. APP. P. 49.7.

A majority of the justices of the Court voted in favor of reconsidering the case en banc.

The en banc court consists of Chief Justice Radack, and Justices Jennings, Keyes, Higley, Bland, Massengale, Brown, Huddle, and Lloyd.

Justice Massengale, writing for the majority of the en banc court, joined by Justices Bland, Brown, Huddle, and Lloyd.

Chief Justice Radack, joined by Justices Jennings, Keyes, and Higley, dissenting.

Publish. TEX. R. APP. P. 47.2(b).